UNITED STATES, Appellant

v

CHARLES E. MAY, JR., Private E-2, U. S. Army, Appellee

10 USCMA 258, 27 CMR 432

359

No. 12,426

Decided April 24, 1959

*First Lieutenant Wade H. Sides, Jr.,* argued the cause for Appellant, United States. With him on the brief were *Colonel H. D. Shrader* and *Major Thomas J. Nichols.*

*First Lieutenant Thomas J. Simmons* argued the cause for Appellee, Accused. With him on the brief were *Colonel James Garnett* and *Captain Arnold I. Melnick.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused, upon his plea of guilty, was convicted by general court-martial of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and was sentenced to a bad-conduct discharge and total forfeitures. The convening authority approved only so much of the sentence as provided for a bad-conduct discharge and forfeiture of $50.00 per month for six months. He ordered the sentence executed, suspending the execution of the punitive discharge "until completion of appellate review." No provision for automatic remission was made. On September 26, 1958, a board of review affirmed the findings but, concluding that the suspension of the punitive discharge "until completion of appellate review" was a suspension for an "indefinite period," it modified the sentence by altering the terms of the suspension so that the execution of the discharge was suspended for six months with provision for automatic remission at that time unless the suspension be sooner vacated.

In accordance with the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Army requested this Court to review this case on the following question of law:

Was the board of review correct in holding that the convening authority could not legally suspend the execution of the punitive discharge "until completion of appellate review" without also providing for its ultimate automatic remission?

The conclusion of the board of review that a convening authority cannot suspend execution of a discharge without also providing for automatic remission, and its affirmation, after modification, of a sentence which includes such a provision, presents, at first glance, an inconsistency. Generally speaking, when a convening authority acts beyond the scope of his powers, his conduct is a nullity in law. (Cf. *United States v Greenwalt,* 6 USCMA 569, 20 CMR 285; *United States v Roberts,* 7 USCMA 322, 22 CMR 112.) However, this inconsistency evaporates when the problem is closely examined.

The Uniform Code, supra, makes but brief reference to suspended sentences. Nonetheless, the brevity of the language employed serves more fully to emphasize the meaning the Congress chose to attach to suspensions, and the importance of the objects it deemed necessary to achieve by their use.

Article 72 of the Code, 10 USC § 872, provides in part:

"(a) Before the vacation of the suspension of a special court-martial sentence which as approved includes a bad-conduct discharge, or of any general court-martial sentence, the officer having special court-martial jurisdiction over the *probationer* shall hold a hearing on the alleged violation of *probation.* The *probationer* shall be represented at the hearing by counsel if he so desires." [Emphasis supplied.]

The foregoing provisions are limited to two classes of sentences—those ad-

judged by special courts-martial which, as approved, include a bad-conduct discharge and all general court-martial sentences. It should go without saying that Article 72(a) is not at ▮▮▮ all applicable to the suspensions of summary courts-martial sentences, nor to the suspensions of special courts-martial sentences which, as approved, do not include a bad-conduct discharge. Such sentences are, of course, encompassed within the provisions of Article 72(c). "Cast within the structure of [the] Article . . . 'all other sentences' could only mean those not included within the other subarticles." United States v Watkins, 2 USCMA 287, 8 CMR 87. These provisions are clear expressions of the intent of Congress and require no exercise in the art of interpretation. Indeed, because of the clarity of expression employed, no such exercise is legally permissible. United States v Hicks, 6 USCMA 621, 20 CMR 337.

The combination of the words "suspension," "probation," and "probationer," in the context of ▮▮▮ the Article, demonstrates that the true nature of a suspension is ascertainable from a consideration of the effects thereof. It automatically places the individual in a status of a probationer, and prohibits any alteration in that status—to his detriment—without independent cause and without a hearing at which he may be represented by counsel. Unless it is so altered, the accused must be fully restored at the completion of the period of probation fixed in the action.

Examined in the light of earlier provisions relating to suspension, the same result obtains.

Article of War 52, Act of August 29, 1916, 39 Stat 619, 659, provided:

"The authority competent to order the execution of a sentence, including dishonorable discharge, may suspend the execution of the dishonorable discharge until the soldier's release from confinement; but the order of suspension may be vacated at any time and the execution of the dishonorable discharge directed by the officer having general court-martial jurisdiction over the command, exclusive of penitentiaries and the United States Disciplinary Barracks, in which the soldier is held or by the Secretary of War."

That antecedent of the present Code permitted vacation of a suspension at any time and for any or no reason. These provisions remained substantially the same after a critical analysis of military justice undertaken by the Congress subsequent to World War I. Article of War 52, as enacted at that time (Ch II, Sec 1, Act of June 4, 1920, 41 Stat 787), provided in pertinent part:

"The authority competent to order the execution of the sentence of a court-martial may, at the time of the approval of such sentence, suspend the execution, in whole or in part, of any such sentence as does not extend to death, and may restore the person under sentence to duty during such suspension; . . . [T]he same authority may vacate the order of suspension at any time and order the execution of the sentence or the suspended part thereof in so far as the same shall not have been previously remitted, subject to like power of suspension. . . ."

Because of the authority afforded by the foregoing enactment to "vacate the order of suspension at any time and order the execution of the sentence," this provision tended to defeat the purposes of Article of War 50-1/2, enacted at the same time. The latter prohibited the execution of a sentence of "a general court-martial involving the penalty of death, *dismissal not suspended, dishonorable discharge not suspended,* or confinement in a penitentiary, unless and until the board of review shall, with the approval of the Judge Advocate General, have held the record of trial . . . legally sufficient to support the sentence." (Emphasis supplied.) Under these enactments it was possible—at least theoretically—to suspend execution of a discharge, forward the record of trial for "examination," as distinguished from "review," under Article 50-1/2, vacate the suspension, and

order the sentence into execution on successive days, or by successive orders.

Article of War 50, as amended by the Act of June 24, 1948 (Public Law 759, 80th Congress), modified the appellate procedures by requiring review by a board of review of "Every record of trial by general or special court-martial involving a sentence to dishonorable discharge or bad-conduct discharge, whether such discharges be suspended or not suspended, and every record of trial by general court-martial involving a sentence to confinement in a penitentiary." Article of War 51, as amended by the last-mentioned act, prohibited vacation of a suspended sentence and execution thereof prior to the completion of appellate review. There remained, however, .the unencumbered power to vacate such suspension for any or no reason.

The Congressional Committee considering the Uniform Code of Military Justice addressed itself principally to that last remaining defect in the area of suspended sentences. If the language set out in Article 72 of the Code, supra, fails to capture the Committee's purpose, the explanation of the drafters of this provision clarifies the intent of the Article to a point which is free of doubt.

This is what Mr. Robert Smart, the Committee counsel, had to say concerning Article 72:

"*This article requires that where the vacating of the suspension of a serious sentence is contemplated, a record of the facts justifying the vacating action will be made and these facts will be given consideration by two officers.*

"Where the original sentence includes a bad-conduct discharge or dishonorable discharge, or confinement in excess of 1 year, such vacation will not be effective to execute the sentence until the review provided in articles 66 and 67 has been completed . . . ." [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 1207–1208.]

When this explanation was advanced, the following colloquy occurred:

"MR. BROOKS. Mr. Smart, where is that word 'probationer' used there?

"MR. SMART. That is a new word, so far as military law is concerned, Mr. Chairman. Mr. Larkin can give you some information on that point.

"MR. LARKIN. It is used because *I think it most clearly describes the position of the person contemplated in this article.* This article, I might say, Mr. Chairman, is substantially new and it is designed to set up the following procedure.

"There are a number of instances where after the accused has been sentenced and confined he is sent to a retraining command or a retraining center and subsequently is restored to duty. . . .

"Frequently an accused who is returned to active duty has not completed his sentence by a considerable portion and he is returned to duty in effect on probation. The unexecuted part of the sentence may still hang over him but pending his good behavior, upon his return to duty, over a certain period of what is most accurately called probation, he may be able to work his way out of, or to have the unexecuted portion of his sentence and even the dishonorable discharge or the bad conduct discharge set aside, and ultimately get an honorable discharge.

"Now when he is back on duty on probation, there are a number of instances where such persons commit additional offenses or in some way by their conduct violate the standard of good behavior. In the same fashion as in civilian courts, upon such violations, they may be returned to serve out the unexpired portion of their sentence or the dishonorable discharge or bad conduct discharge which has been suspended may be revoked.

"To assure that when a man who has been returned to duty and is charged with violation of this state of probation, that the suspended sen-

tence that he has received or the suspension of the balance of the execution is not capriciously revoked or arbitrarily revoked, and that the dishonorable discharge will not be capriciously executed and have him discharged from the Service, we have provided this type of hearing so that the elements of the offense or the facts of the conduct which is charged amounts to a violation on his part, are clearly set forth.

"We have provided this procedure which, as I say, is substantially new. It is a protection for the accused.

"It is perfectly true that there are any number of instances where a man who is given this other chance just does not make good at all and in a large number of those cases he should have a vacation of the suspension; that is, a vacation of the suspension is entirely appropriate and he should be sent back to serve out the unexecuted portion of his sentence, or it is perfectly appropriate that the dishonorable discharge be executed. All that this provides is that it will be done after this protective procedure." [Hearings, supra, pages 1208–1209. Emphasis supplied.]

Viewed in the light of this Court's precedents, the same result is reached. In United States v Watkins, supra, the accused was sentenced to a bad-conduct discharge and partial forfeitures. The supervisory authority suspended execution of the discharge and ordered execution of the forfeiture portion of the sentence. The board of review held that because the sentence included a punitive discharge, Article 71(c) prohibited execution of any portion thereof until completion of appellate review. Speaking through Judge Latimer, a unanimous Court declared the supervisory authority's action was proper if the suspension of the discharge was effective. Addressing itself to the effectiveness of the suspension, the Court held:

"The principles controlling the nature of the suspension of the punitive discharge in the instant case are, to some extent, interwoven with those governing the power of the supervisory authority to order execution of the forfeitures. Here, execution of the bad-conduct discharge until completion of appellate review was specifically prohibited by the provisions of Article 71(c). In view of this, Government appellate counsel contend that a suspension during the appellate phase is automatic, and that the supervisory authority's order of suspension, if not illegal, was unnecessary and of no force or effect. We would be able to discern some merit in this contention were it not for the fact that the language of the articles appears merely to bar the execution of the punitive discharge, and although the practical effect may be the same, it is not an actual suspension. The word 'unsuspended' in the provision is apparently used as a word of art intending to mean the absence of some affirmative action. Were this not the case its inclusion would serve no useful purpose since, under the other interpretation, all such sentence[s] would be suspended automatically."

Although the Court was there concerned with the word "unsuspended," as used in Article 71, the word "suspension," as found in Article 72, must be viewed in the same light. It is but the other side of the same coin.

Finally, if we examine the legislation in question under the light of empirical observation, our originally expressed conclusion is further confirmed. What, we ask, is the point of suspending execution of a punitive discharge? The action of the convening authority in this case would appear to require the answer that it is for the purpose of collecting a pittance of forfeiture which could not otherwise be accomplished. Could this have been the intent of Congress? Whatever attributes may be ascribed to that body, "penny-pinching" is not one of them. Could it be for the purpose, in an appropriate case, of exacting hard labor of an accused as a "sentenced prisoner" before completion of appellate review? Hardly, for the draftsmen of the Code announced they were interested in affording the accused

additional protection against arbitrariness and capriciousness.

If a punitive discharge suspended without the provision for remission is automatically executed upon completion of appellate review, as the Government here contends, a similar result must follow the suspension of any other portion of a sentence. Under such a view, were a convening authority to suspend, without provision for remission, only the confinement portion of a sentence which included a punitive discharge, confinement and forfeitures, the accused would be required to commence serving the approved term of confinement automatically upon completion of appellate review whatever his intervening conduct may have been. Even the most callous of disciplinarians would reject such a notion.

Thus, by whatever light Article 72 is examined—by reference to its provisions alone, by analysis of its historical development, through the expressions of its drafters' intent, or by its actual operation—but a single conclusion is possible. Once a convening authority so empowered, undertakes to suspend any portion of a sentence, such suspension—without reference to the language employed or omitted—constitutes the accused a probationer whose status may be changed only after a full hearing. As used in the Uniform Code, the word "suspended" is a word of art conveying the single meaning described above. See United States v Watkins, supra.

We are, of course, aware that the services have not considered that but a single type of suspension is established by Article 72. The opinions of boards of review and the cases reaching this Court upon appeal or certification indicate that at least three general types of additional "suspensions" have been devised since the promulgation of the Uniform Code.

One of these is the so-called "technical suspension," employed most frequently by the Navy. Here, ▇▇▇▇▇▇ ▇ the discharge is suspended pending completion of appellate review, largely to insure against

**364**

the inadvertent execution of punitive discharges prior to completion of appellate review. In this type of case, neither the convening authority nor the accused believe that such a "suspension" contemplates restoration to duty, and neither gains or loses anything as a result of such action. Stated otherwise, the convening authority in such an instance is doing no more than that which Article 71(c), supra, requires. The word "suspension" in these circumstances is not used in the precise sense of Article 72. While such a case is not now before us, it does not appear that a sentence, nor any portion thereof, suspended only pending appellate review, requires the type of hearing contemplated by Article 72 prior to issuance of an order directing its execution. However, this form is improper and should not be used.

Another type is that which is carved out by the Manual for Courts-Martial in paragraph 88e(2)(b), providing in pertinent part:

"If the approved sentence involves a dishonorable or bad conduct discharge and confinement, the convening authority may determine that the execution of the punitive discharge should be suspended to the end that the accused may have the opportunity of redeeming himself in the military service, but that the execution of the confinement should not be suspended. In such a case, he may suspend the execution of the punitive discharge until the release of the accused from confinement, or for a definite period thereafter, and provide in his action for the automatic remission of the suspended sentence as indicated in the preceding subparagraph. However, the convening authority may suspend the execution of the dishonorable or bad conduct discharge until the release of the accused from confinement without providing for an automatic remission of the suspended portion. In such a case, when the accused is released from confinement, the necessary administrative action may be taken to effect the punitive discharge without the publication of further court-mar-

tial orders and without a hearing under the provisions of Article 72."

In suspensions of this type the determination of the factual question of the accused's restorability is not made by the convening authority at the time of his initial action upon the sentence. Rather, he defers this decision until a later date, and he may even transfer the responsibility for the decision to another commander. Such action cannot be taken. United States v Cecil, 10 USCMA 371, 27 CMR 445, decided this date. Cf. United States v Butts, 7 USCMA 472, 22 CMR 262.

The final general type of suspension apparently springs from the suggestion found in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, (page 126), that a suspension of a punitive discharge pending release from confinement "may be desirable, especially when the sentence involves a short (less than one year) period of confinement which may be served prior to the completion of the appellate review; otherwise the accused might get credit for his entire sentence to confinement even though in the status of an 'unsentenced prisoner.' " The ingenuity of individual staff judge advocates was spurred by this suggestion, and one of the variants, of which they have been the architects, is presented by this case. Other variations are found when, upon the recommendation of the staff judge advocate—entrusted by the Code with the administration of its provisions, not the modification thereof[1]—the convening authority reduces a sentence of confinement for one year to confinement for a day or two less than one year, suspends execution of the discharge, until expiration of the confinement or completion of review, and orders the remainder into execution. Another variation effects the reduction of an accused prior to the final action. See United States v Rogers, WC NCM 58–01141, decided September 10, 1958. In each of these variations something is exacted from the accused

---

[1] United States v DeAngelis, 3 USCMA 298, 12 CMR 54.

which the law does not permit in the absence of a true suspension. Confronted by such variation, a Navy board of review had this to say:

". . . It stretches logic and reason beyond a reasonable interpretation of the wording found in Article 71(d), UCMJ, to hold that Congress intended a suspension of execution of a sentence, other than a probationary suspension, to be used to uphold legally an order of execution which takes material rights away from the accused. It is our view, therefore, that *since the convening authority in the instant case suspended the execution of the bad conduct discharge and ordered into execution the reduction in rate with attendant and immediate reduction in pay from the pay level of a seaman to the pay level of a seaman recruit,* the suspension of execution of the bad conduct discharge in the instant case is a bona fide suspension on a probationary basis which will ripen into remission in the event the suspension of execution is not vacated by a hearing and an order vacating suspension as required by the provisions of Article 72, UCMJ." [United States v Rogers, supra.]

We subscribe to this approach, for to declare that a suspended portion of a sentence may ever be ordered executed without the hearing required by Article 72, supra, would require us not only to pervert the clear language of that enactment, but also to ignore the very well-established principle that revocation of the suspension of a sentence without a hearing, particularly where provided for by statute, will not be countenanced. Escoe v Zerbst, 295 US 490, 55 S Ct 818, 79 L ed 1566; Brown v United States, 236 F2d 253 (CA 9th Cir) (1956), cert den 356 US 922, 78 S Ct 705, 2 L ed 2d 716; Bennett v United States, 158 F2d 412 (CA 8th Cir) (1946), cert den 331 US 822, 67 S Ct 1302, 91 L ed 1838; United States v Lowe, 173 F2d 346 (CA 2d Cir) (1949), cert den 337 US 944, 69 S Ct 1499, 93 L ed 1747; United States v Van Riper, 99 F2d 816 (CA 2d Cir) (1938), cert den 311 US 696, 61 S Ct 134, 85 L ed 451; rehear den 311 US

730, 61 S Ct 390, 85 L ed 475; Annotation, 29 ALR2d 1074.

To hold otherwise would require the view that, despite the language in Article 72, despite the clearly expressed intent of Congress, and despite the prior pronouncements of this Court, a convening authority can, by the simple expedient of omitting a provision for remission, suspend a sentence, and thereafter order its execution for any or no reason without the necessity of conducting the hearing Congress has said is necessary to forestall arbitrary and capricious action. This would permit a convening authority to have his cake and eat it as well. It would constitute simply a prime example of the tail wagging the dog. It would require us to hold that, while the President of the United States cannot thwart congressional action by Manual provisions,[2] a subordinate convening authority can accomplish that result with a single stroke of a pen. If this be true, rather than create and guarantee the independence of truly judicial tribunals by the Uniform Code, Congress merely established a spawning ground for ungoverned and ungovernable sharp practices. No responsible appellate court would subscribe to such an absurd view.

Appellate Government counsel have urged the view that this Court specifically aproved the same action taken by this convening authority in United States v Watkins, supra, and United States v Trawick, 10 USCMA 80, 27 CMR 154. Hence, they argue, the board's conclusion that the action was illegal without modification is contrary to the law announced in those decisions.

These contentions are predicated upon a misconception of the full import of the board of review's position, and of the decisions of this Court. We have, heretofore, pointed out that the inconsistency allegedly characterizing the board's position is of the surface variety only. Our own position taken in the *Watkins* and *Trawick* cases, supra, confirms the position we and the board take in the instant case. In those cases we were concerned solely with the legality of the partial forfeiture aspect of the sentence, and held it proper. In neither decision were we called upon to discuss the *effect* of the suspension of a punitive discharge, although we recognized the existence of the problem and specifically reserved it in *Trawick*.

It follows from this that in the instant case the convening authority's failure to provide for automatic remission was not fatal to the advent of a probationary status. That status came into being from the action suspending the punitive discharge and ordering partial forfeitures executed.

Left for consideration is the specific action taken by the board of review in this case. The board modified the suspension originally granted, "until completion of appellate review," to a suspension for a period of six months. While such a modification would not in all cases accomplish a reduction in the period, it has that effect here. This action, regardless of the reasons which prompted it, is safely within the board's power. Cf. United States v Estill, 9 USCMA 458, 26 CMR 238.

In sum, we answer the question certified in the negative by declaring that the convening authority's action suspending execution of the punitive discharge automatically creates a status of probation which may not be altered save as provided for in Article 72 of the Code, supra.

The result arrived at by the board of review is consistent with the requirements of the Uniform Code. Accordingly, we affirm its decision.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

By some method of reasoning, my as-

[2] United States v Kelley, 7 USCMA 584, 588, 23 CMR 48; United States v Greer, 3 USCMA 576, 578, 13 CMR 132; United States v Eggers, 3 USCMA 191, 195, 11 CMR 191; United States v Rosato, 3 USCMA 143, 145, 11 CMR 143.

sociates reach a result which is contrary to the Code, the Manual, ▮ United States v Watkins, 2 USCMA 287, 8 CMR 87, and other cases which have clothed a convening authority with broad powers to suspend sentences. Moreover, by judicial fiat they categorically extend an act of suspension to embrace remission and probation. There is no common denominator for the three different acts, and a hasty reference to any standard dictionary will show why there is no similarity. See also United States v Estill, 9 USCMA 458, 26 CMR 238. In addition, they mistakenly state, "Once a convening authority so empowered, undertakes to suspend [the execution of] any portion of a sentence, such suspension—without reference to the language employed or omitted—constitutes the accused a probationer whose status may be changed only after a full hearing." Significantly, Article 72(a), Uniform Code of Military Justice, 10 USC § 872, is, by its own terms, restricted in its application and does not require a hearing before suspension of *all* sentences may be vacated. See also Article 72(c) of the Code, supra. Manifestly, then, from the statute itself it is crystal clear that the term "suspended" is not at all "a word of art conveying the single meaning" ascribed to it by my associates. If it were, then the suspensions covered by Article 72(c) would also give rise to the status of probation, yet the unequivocal language there used by the Congress is obviously to the contrary. In fact, the majority concedes that the same "term of art" which they state conveys but a "single meaning" does not carry that meaning in subarticle (*c*). And even under subarticle (a), they admit that what they term a "technical suspension," as commonly used by the Navy, does not carry with it a status of probation. I encounter great difficulty in comprehending how my associates reconcile their holding that suspension is a term of art with but one import—necessarily accomplishing a probationary status—when they themselves acknowledge the same term in the same Article does not have that significance and that a convening authority can use that term in

his action without effecting probation. And, although my brothers cite United States v Watkins, supra, as authority for their proposition, I am unable to find in that case or in any other where we have ever equated the terms "probation" and "suspension."

As a starting point for my presentation, I call attention to the fact that in the recent case of United States v Estill, supra, we reaffirmed the doctrine that a board of review does not have the power to suspend the execution of a sentence. In this case, then, the sole issue is whether the convening authority, by suspending the execution of the punitive discharge until completion of appellate review, placed the accused on probation. I say he did not, and in that connection I refer to Article 72 of the Code, supra, which provides:

"(a) Before the vacation of the suspension of a special court-martial sentence which as approved includes a bad-conduct discharge, or of any general court-martial sentence, the officer having special court-martial jurisdiction over the probationer shall hold a hearing on the alleged violation of probation. The probationer shall be represented at the hearing by counsel if he so desires."

It is to be noted this Article requires the officer having special court-martial jurisdictional over the accused to hold a hearing on the alleged violation of probation. That requirement presupposes that the suspension is one which is predicated upon conditions over which the accused has some control. That presupposition is in keeping with the concept that probation is a status whereunder a person convicted of an offense is allowed to go at large under a suspension of sentence, during good behavior and generally under the supervision of some one designated by the court or by law. Congress certainly envisioned that status when it enacted Article 72, for it used the terms probationer and probation.

My associates quote at length from the Hearings on the Code and emphasize Mr. Larkin's statement that the term "[probationer] most clearly de-

scribes the position of the person contemplated in this article." However, they fail to note the language which immediately precedes the comments they quote from the Hearings. It tells us the identifying characteristic of this contemplated person, gives us the key to our entire discussion, and neutralizes their extensive quotations:

"This article is new. *It applies where a sentence has been suspended pending good behavior of the accused,* that is, where the accused is a probationer." [Emphasis supplied.]

Hearings before the House Armed Services Committee on H.R. 2498, 81st Congress, 1st Session, page 1207.

A hearing on an alleged violation of probationary status would be absurd if there were not conditions imposed on an accused with which he was required to comply to escape punishment. A suspension of execution is only a temporary bar, and I defy anyone to suggest a way in which it can be shown sensibly that an accused has any control over an impediment which is automatically removed by the completion of appellate review. In the present instance, the condition was only one of time, that is, the suspension was in effect only until the conviction was finalized, at which time the bad-conduct discharge was to be executed. Now I ask, how would the accused either live up to or violate that term or condition? And, what possibly could the Government establish as the "alleged violation of probation?" The answers are obvious for, unless we reverse United States v Estill, supra, and hold that a board of review can suspend a sentence, or we change entirely the wording, nature, and legal effect of the convening authority's act, the accused never becomes a probationer under any acceptance of that term. I know of no legal support for either alternative, and so I encounter great difficulty in understanding how terms, automatic remission, and restoration to duty can be read into an act of the convening authority which shows positively that those forms of clemency were not within his contemplation. Rather, they are,

in fact and law, diametrically opposed to results he intended to reach. Of course, any given result can be reached if the prime objective of a statute is ignored or misunderstood. The sole purpose of Article 72 is to prevent the arbitrary setting aside of a grant of clemency without proof that the grantee had broken faith with the grantor. But that is not involved in this case, for no representation was made that the convening authority was extending mercy which would be withdrawn only upon a showing by the Government that, due to accused's subsequent conduct, it was not merited. The only consideration held out to this accused was that the punitive discharge would not be executed until a certain contingency had happened. When the contingency occurred, any benefit bestowed upon him automatically terminated without regard to his good or bad behavior. Even if his conduct was reprehensible, by law, the punitive discharge could not be executed until the designated time and, if his behavior was exemplary, that would make no difference either for the convening authority's action directed execution of the discharge upon completion of appellate review.

Moreover, overlooked entirely is the fact that in this type of suspension, if the period extends beyond the time appellate review is completed, the Government does not contend that during the time from affirmance of sentence until the end of the period, an accused is not entitled to a hearing before the punitive discharge can be executed. The Government concedes, so long as the suspension is operative, the provisions of Article 72 must be complied with and the accused is afforded his statutory right. However, when, by its terms, the suspension expires and is no longer in effect, then there is nothing to be heard. The convening authority's grant of clemency has been fulfilled by the Government, and the conditions of the suspension are merely endorsed. It is under those circumstances that the Government asserts—and I believe rightly—that no hearing is necessary.

At times, it may be necessary to ex-

tend the meaning of words and phrases to give effect to the intent of Congress, but here there is no necessity to go that far. As we stated in United States v Watkins, supra:

". . . The Code and Manual contain no specific restrictions as to the reasons which may motivate a suspension. Certain considerations which are intended to be influential in limiting such action are proposed, but the tenor of the paragraphs dealing with the subject denotes a discretionary power in this regard. Certain it is that we should not graft on any limitation not expressed in the Code or Manual."

There is neither a need to convert every suspension into an automatic remission nor to create a probationary status. In civilian courts, the execution of a sentence may be suspended for a variety of reasons, such as to permit a defendant to perfect his appeal or to arrange his business affairs—this despite the statement of my associates that "Even the most callous of disciplinarians would reject such a notion." That is not to say, however, that the delay granted by the court places the defendant on probation for all time. The device of probation is a means of placing an accused in a preferred status and fitting the punishment to the crime after time has allowed him to exhibit traits of character which prove he has some value and is a worthwhile subject for rehabilitation. In the military, the privilege is only bestowed upon those accused persons who have some potential value to the service. The power to create the status of probationer in the lower military echelons is vested in the convening authority, and obviously the grant is discretionary with him as an accused has no statutory or constitutional privilege to that form of mercy. Certainly, when one possessing the authority affirmatively shows in his order that he does not intend to place an accused on probation, a board of review exceeds its authority when it creates that status out of his order. Here, the action of the convening authority shows the punitive discharge is to be executed in all events unless found inappropriate on appeal, and I find no legal basis for a board of review to interfere with his order in the manner herein attempted.

In passing, I point out that while several cases are cited in the base opinion for the proposition that a suspension of sentence cannot be revoked without hearing, in each of those cases the situation is one where a convicted person had been granted liberty upon fixed conditions for a breach of which his liberty would be revoked. If such was the posture of the case at bar, the difficulties I encounter would be greatly reduced, but manifestly it is not, and to my mind the cases are useless additions which do not aid my brothers.

Contrary to the present holding, the framers of the Manual—and at least their construction was contemporaneous with the Code—envisioned a suspension which did not create the status of probation, for paragraph $88e(2)(b)$ provides in part:

". . . However, the convening authority may suspend the execution of the dishonorable or bad conduct discharge until the release of the accused from confinement without providing for an automatic remission of the suspended portion. In such a case, when the accused is released from confinement, the necessary administrative action may be taken to effect the punitive discharge without the publication of further court-martial orders and without a hearing under the provisions of Article 72. To avoid the possibility in such a case of the inadvertent execution of the punitive discharge prior to completion of appellate review, the action should provide for the suspension of the punitive discharge until the accused's release from confinement or the completion of appellate review, whichever occurs later."

Much as my associates prefer to invalidate the Manual provisions, Article 71(d), Uniform Code of Military Justice, 10 USC § 871, authorizes a convening authority to suspend the execution of any sentence except death, and his power to set the conditions is

not limited. Pretermitting the question with which we were concerned in *Watkins,* supra, the Manual is in no way contrary to the codal provision, nor is it at variance with civilian law. Why then, I ask, do we cast it aside and saddle a convening authority with the restriction under which he can suspend any part of a sentence, but when he does, conditions contrary to those he comprehended are superimposed on his action? Congress did not say every suspension brought an accused under the coverage of Article 72(a). In fact, the codal provision is exactly to the contrary, and the effect of the Court's opinion is to ignore and rewrite the law.

Apparently one of the reasons for casting out the Manual provision is because of possible abuses by military authorities. That reasoning I cannot follow. It should be crystal clear from the legislative development of Article 72 set out in the Court's opinion and the Committee hearings prior to its enactment that Congress intended simply to safeguard the rights of an accused once he had been awarded a probationary type suspension. No one has suggested when that status is created, corrupt practices are indulged in. The only possible vice has to spring out of denying a hearing to a person not intended to be placed on probation. The principle that accused persons receiving this form of suspension are probationers is, of course, entirely dependent for its validity upon the Court's original thesis —a thesis that, in my opinion, remains yet to be demonstrated. How, with any logic, it can be said a procedure which allows a convening authority to vacate this form of suspension without hearing is "a spawning ground for ungoverned and ungovernable sharp practices" when, at the time the order is entered, the accused is deemed unworthy of probation, when there is no intent on the part of his superiors to grant such a benefit, and when he is deprived of nothing to which he is entitled but in order to give him one last chance a convening authority has decided to delay the final day of judgment, is beyond my comprehension.

370

A simple understanding of the operations of this form of suspension would make it unnecessary for my associates to conjure up possible abuses. The Code automatically bars the execution of a punitive discharge until the completion of appellate review. In a great many instances, the period of confinement has not expired when that contingency occurs, and the convening authority, by providing for suspension until release from confinement, has given an accused additional time to prove his worth to the service and avoid his separation from the service under dishonor. Once a punitive discharge is executed, there may be both legal and administrative complications in restoring an accused to duty and clearing his military record of his punitive discharge. This form of suspension avoids that possibility and, even assuming an accused may lose a "penny" or do a few days hard labor, he gets a chance to escape the most serious punishment. Surely, when a convening authority acts and grants an accused some benefit to which he is not entitled, even assuming it infinitesimal—which I do not—I fail to see how the grant of such clemency can be catalogued as a sharp practice. Furthermore, for some seven and one-half years we have tacitly approved the procedure used by the services and, to my knowledge, no abuse of this process has been called to our attention.

Moreover, the impact of this piece of judicial legislation merits some comment. When an accused person is a fit subject to become a probationer, the convening authority usually provides for suspension and automatic remission. We are not here faced with persons of that character. However, in connection with suspension under the Manual provision, my colleagues pose the question "What . . . is the point of suspending execution of a punitive discharge?" and imply that accused persons are victims of some monstrous conspiracy of the services whereby otherwise uncollectible forfeitures are extracted or hard labor as a sentenced prisoner exacted. They, however, characterize the money involved as a pittance and, indeed, although unsentenced

prisoners cannot be made to perform hard labor, certainly they are not allowed to remain idle and their incarceration can hardly be considered a vacation. Moreover, it should be borne in mind that the punishments involved result from the lawfully adjudged sentence for accused's criminal conviction on his plea of guilty, which has been affirmed on review. It would seem, then, that the impact against an accused brought about by the suspension is not nearly so onerous as the majority implies, and apparently they choose to ignore the plain fact that suspensions of the instant type hold out to serious offenders the opportunity of restoration—an obvious and substantial benefit which those persons will, no doubt, no longer be accorded in light of my associates' holding in the case at bar. For myself, I take the view that from this kind of suspension a definite advantage redounds to offenders. I cannot find any harsh impact against convicted persons, and hence it is most difficult—and I for one am unwilling—to impute to military authorities a desire to extract from accused persons the last pound of flesh. If they were guided by that principle, convening authorities would merely affirm every finding and sentence without a suspension of any kind. As I have endeavored to demonstrate earlier, there is no sound basis upon which to conclude the Manual provision under which the services operate is illegal, and certainly I must register my disagreement with a holding which, in invalidating it, strips from offenders the prospect of a very substantial benefit.

One other error in the Court's opinion is apparent. If this controversy hinges on giving the accused a hearing pursuant to Article 72 before the punitive discharge can be executed, the Court is ruling prematurely. A hearing on a vacation of a suspension is no part of a sentence, and it raises no issue until such time as the Government seeks to proceed without complying with the law. If, as my colleagues contend, every suspension automatically makes an accused a probationer under the last-mentioned Article, then when the Court interferes before appellate review is complete so that any hearing is required, the accused is the beneficiary of a right which has not yet accrued. Criminal processes ought to be orderly, and anticipatory breaches have no place in the scheme of things. Merely because a ruling benefits an accused does not make it legal.

I would answer the certified question in the negative and reverse the decision of the board of review.